# In the United States Court of Federal Claims

No.07-211C

(Filed: November 28, 2007)

* * * * * * *

AMERICAN RED BALL INTERNATIONAL, INC., et al., *

Plaintiffs, *

v. *

UNITED STATES OF AMERICA, *

Defendant. *

* * * * * * *

Motion to Dismiss; RCFC 12(b)(6); Tucker Act; Contract Disputes Act; Consideration.

**ORDER AND OPINION**

The Department of Defense contracts with private companies to provide support for military personnel and their families when assigned to new duty stations. These moving companies are qualified by the Government based on a series of Department of Defense regulations. One of these regulations states that movers must declare any common ownership, because commonly owned movers cannot bid on contracts in the same geographical area.

Plaintiffs in this case were separate and independent corporations until 1993, when they declared common ownership according to applicable regulations. They negotiated an agreement with the Government that allowed them to qualify for international business. The 1993 Exception Agreement included a clause stating that the Government could cancel the Agreement at any time, should matters come to its attention warranting a change in circumstances. The Government gave plaintiffs notice of its intent to cancel the Agreement in 2005, because of a proposed new bidding program.

Plaintiffs sued in this court for breach of contract, asking that the court declare their rights under the Exception Agreement and enjoin defendant from terminating the Agreement. The Government filed a motion to dismiss alleging lack of jurisdiction and

failure to state a claim. We grant the Government's motion for the reasons set forth below.

## BACKGROUND

Plaintiffs are moving companies that have participated for many years in a Department of Defense program supporting military service members who receive orders to change duty stations. The Government's Personal Property Program is now administered by the Surface Deployment Distribution Command, which facilitates the shipment of service members' household goods, unaccompanied baggage, and privately owned vehicles.[1]

The Personal Property Program has components covering domestic and international moves, and transportation of mobile home and boats. The Surface Deployment Distribution Command must approve movers proposing to participate in the Program. *See* HOW TO DO BUSINESS IN THE DEPARTMENT OF DEFENSE PERSONAL PROPERTY PROGRAM 7-8 (2007). Qualifications include "satisfying the Tender of Service . . . PowerTrack agreement and certifications . . . ." *Id.* A Tender of Service provides details concerning a mover's qualifications and performance requirements. *Id.* The mover must submit an Electronic Tender of Service Signature Sheet certifying that it has no common financial or administrative control of another company. That is, no other company has "the power, actual as well as legal, to influence the management, direction or functioning of a [mover]." *Id.* at 33. The International Program, prohibits movers from competing in the same rate channel or in the same code of service. The Government "reserves the right to revoke any [mover's] approval at [its] sole discretion." *Id.*

### The 1993 Exception Agreement

Plaintiffs were separate legal entities until 1993, when the owner of Vanpac and Echo, sold his businesses for health reasons. Red Ball agreed to purchase Vanpac and Echo, provided the sale would not trigger the prohibition against common ownership.

---

[1] Shipments are transported pursuant to government bills of lading. The bills of lading evidence the contracts between the Government and movers such as plaintiffs here. The mover offers transportation services for a set cost. A contract arises when the Government accepts the offer. Defense Transportation Regulations govern this program. *See* DOD 4500.9-R, and 48 C.F.R. 47.301-3 ("All military and civilian agencies shipping, or arranging for the acquisition and shipment by Government contractors, through the use of military-controlled transport or through military transshipment facilities shall follow Department of Defense (DoD) Regulation DoD 4500.9-R.").

Plaintiffs negotiated with the Government for an exception to the applicable regulation. The resulting Exception Agreement allowed plaintiffs to remain qualified bidders in the International Program regardless of common ownership, so long as they could demonstrate and maintain independent day-to-day operations. Paragraph 6(b) of the Exception Agreement states, "[s]hould matters come to the attention of [the Government] which warrant a change in its position, [the Government] reserves the right, upon due notice to the parties . . . unilaterally to terminate this agreement."

Families First Program

The Government developed the Families First Program in 2002 as a means of improving quality of life for service members and their families.[2] The new program will award shipments on a "best-value" approach rather than a low-cost basis. Best value is determined by a mover's prior performance as well as its rates. Performance and rates are calculated by considering customer satisfaction and claims-handling in addition to price. The Families First Program requires an electronic system for billing, payment, and measurement of customer satisfaction. The automated system also requires "automatic rejection of the international rates of both [movers] when two [companies] . . . submit rates for the same channels in the same code of service." *See* FAMILIES FIRST BUSINESS RULES 2.7 (2006).

Plaintiffs sought clarification from the Government on how the new program would affect their Exception Agreement. Vanpac sent letters "requesting advice on how [it] may continue to file rates in the Families First International program in accordance with its written agreement with [the Government] dated November 30, 1993." Cmpl., Attach. 2 p. 3. The letters stated that the proposed automated system in Families First would prevent Vanpac and Echo from filing international rates because the new program would automatically reject their submissions. Cmpl., Attach. 2 p.4. The Government responded on November 30, 2006, invoking paragraph 6(b) of the Exception Agreement, "to terminate the agreement concurrent with Families First implementation. Thus, [the] exemption will expire with the start up of Families First." Cmpl., Attach. 4.

Plaintiffs sued in this court for breach of contract under the Contract Disputes Act. The Government filed a motion to dismiss for lack of jurisdiction and for failure to state a claim pursuant to Rule 12(b)(1) and 12 (b)(6).

## DISCUSSION

---

[2] Families First is not yet in place. The Government anticipates that it will be implemented fully before the end of this year.

Jurisdiction

The Government has raised the issue of subject matter jurisdiction, so plaintiffs must establish jurisdictional facts to survive the motion to dismiss. *See* RCFC 12(b)(1); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). The court assumes that all well-pled allegations in the complaint are true and draws all reasonable inferences in plaintiffs' favor. Pursuant to Rule 12(b)(6), "[a] motion to dismiss for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not, under the law, entitle him to a remedy." *Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998).

The Tucker Act gives this court jurisdiction to consider a claim for an "independent substantive right enforceable against the United States for money damages." *See* 28 U.S.C. § 1491 (2000). The Tucker Act states,

> [t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491 (a)(1).

This court may render judgment upon "any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract . . . and other nonmonetary disputes on which a decision of a contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2); *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1264 (Fed. Cir. 1999). The Contract Disputes Act provides jurisdiction of a contractor's request for relief when the contractor has filed a claim and obtained a contracting officer's final decision. *Alliant*, 178 F.3d at 1264.

Plaintiffs' Claims

Plaintiffs argue that they had a contract with the United States pursuant to the Contract Disputes Act because that Act pertains to "contracts for the procurement of services." *See* 41 U.S.C. § 602(2). Plaintiffs' claim falls under the CDA because their duties include relocation services for military families, they contend. Defendant responds that the Exception Agreement is not a contract at all, let alone a contract for services. Because the Agreement is not a valid contract, it cannot be a contract for services

pursuant to the CDA, according to the Government.

Mutual Contract

The general definition of a contract is "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RESTATEMENT (SECOND) OF CONTRACTS, §1. A contract with the United States requires the following elements: (1) lack of ambiguity in offer and acceptance; (2) mutuality of intent to contract; (3) actual authority to bind the Government; and (4) consideration. The parties must possess contractual intent and their agreement must be sufficiently definite to be enforced. *Modern Sys. Technology Corp. v. United States*, 24 Cl. Ct. 300 (1991).

The Government contends that it had no intent to enter a contract by issuing the Exception Agreement, and no valid consideration existed for either party. Defendant points out that the parties did not include remedies for breach, for example. *See Trauma Serv. Group Ltd.*, 33 Fed. Cl. 426 (holding agreement not enforceable under the Tucker Act where it does not set out a remedy for breach or nonperformance). *But see Total Medical Management, Inc. v. United States*, 104 F.3d 1314, 1320 (Fed. Cir.1997) (stating that remedies for a breach need not be listed in a contract where "the obligations of the parties are clear . . . [and] the determination of damages or specific performance would flow naturally from a breach of these duties."), and *United States v. Winstar Corp*., 518 U.S. 839, 869 n. 15 (1996) (observing that "failure to specify remedies in the contract is no reason to find that the parties intended no remedy at all.").

Paragraph 5 of the Exception Agreement lists plaintiffs' obligations as a business combination. The Government permitted plaintiffs to operate so long as they met the paragraph 5 obligations. Defendant's agreement arose when and so long as plaintiffs met their obligations. Then, as stated in paragraph 6, "Vanpac and Echo can continue in the . . . program without their operations being considered as violative of [joint operation] prohibitions." (Exception Agreement, November 30, 1993, p. 4) The final paragraph of the Agreement states, "[a]ll parties agree and accept that this agreement has no binding effect upon any persons other than the parties to this agreement." *Id.* at p.5. Plaintiffs contend that such language shows that the parties intended the Agreement to be binding on both parties.

If the parties intended to be bound mutually, the issue would become consideration. Consideration is a "detriment incurred by the promisee, or a benefit received by the promisor at the request of the promisor." *Woll v. United States*, 45 Fed.Cl. 475, 476 (1999). Performance of a pre-existing legal duty is not consideration.

*See Allen v. United States*, 100 F.3d 133, 134 (Fed. Cir.1996) (citing *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1574 (Fed. Cir. 1991)).

Plaintiffs had a pre-existing duty to maintain separate and independent operations. Government regulations prevented them from having "the power, actual as well as legal, to influence the management, direction or functioning" of other companies that "compet[e] in the same rates and channels." The Exception Agreement permitted plaintiffs to form a business association and participate in the International Program; otherwise, they would have been required to remain separate. Thus, the Agreement allowed plaintiffs to combine according to limited exceptions to existing regulations. The Exception Agreement did not make substantive changes in plaintiffs' obligation to show the Government that they were operating independently as part of a business combination pursuant to applicable regulations.

## CDA Contract

The Exception Agreement was not a contract for services, but an exemption from government regulations that otherwise would have prohibited plaintiffs from submitting bids to the Government. The Agreement allowed plaintiffs to bid on moving contracts in the International Program. A contract under the CDA arose when the Government accepted plaintiffs' bid for services. The Agreement cannot be considered a contract for services under the Contract Disuptes Act.

Plaintiffs contend that letters written from Vanpac's president to the Government constitute a claim to the contracting officer as required by the CDA. They cite the Agency's response invoking paragraph 6(b) of the Exception Agreement as a final decision by the Government. Vanpac's letters do not make a demand for money as a matter of right for a duty owed. *See* 48 C.F.R. § 33.201, and *CW Gov't Travel*, 61 Fed. Cl. at 579. The Government's response to those letters was not a final decision within the meaning of the CDA. The Agency acknowledged Vanpac's letters and advised plaintiffs that it had invoked a provision of the Exception Agreement that permitted the Government to terminate its grant of exception to plaintiffs. The contracting officer could not have issued a valid final decision in absence of a valid claim.

## Valid Claim

The Contract Disputes Act does not define "claim," but Federal Acquisition Regulations describe the term as a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating

to this contract." 48 C.F.R. § 52.233-1; *Alliant Techsystems*, 178 F.3d at 1264 (holding that a "claim must be a demand for something due or believed to be due."). The purpose of a claim is to "provide the contracting officer with notice of the relief requested and the legal and factual basis for that request." *Parker v. United States*, 77 Fed. Cl. 279, 286 (2007) (quoting *Alliant Techsystems*, 178 F.3d at 1265).

In *CW Gov't Travel*, a contractor's letters to the contracting officer were valid claims where the letters included a demand that the Government honor an exclusivity clause in the contract. *CW Gov't Travel*, 61 Fed. Cl. at 580 The letter also requested that the contracting officer issue a final decision pursuant to the CDA. *Id*. The court in *Alliant Techsystems* retained jurisdiction where the contractor wrote letters claiming that the agency exercised an option improperly. *Alliant*, 178 F.3d at 1264. The letter stated, "if you disagree with our position, please consider this letter a claim and request for a final decision under the CDA." *Id.* In both cases, the court focused on the demands for relief to which the plaintiffs believed they were entitled.

Plaintiffs in this case did not make demands; they asked for advice.[3] They argue that the Government knew plaintiffs were making demands, but no evidence supports that contention. In fact, plaintiffs made no demands as matters of right. They asked only how the Families First program would affect their Agreement. Their subjective belief that these letters served as demands is not sufficient to satisfy applicable CDA requirements.

---

[3] During oral arguments, plaintiffs' counsel stated that even though the letters were worded in a "gentlemanly" manner, they served as demands to the contracting officer. The language of the letters do not permit such an interpretation, however:

> The purpose of this letter is to *request advice* as to how [Vanpac and Echo]) . . . may continue to file rates in the Families First International Program in accordance with its written agreement with [the Government] . . . ." Letter from Tom L. Olsen, President and CEO of Vanpac, to Judith Tarbox (May 23, 2005) (emphasis added).
>
> *I would appreciate it very much* if you could have someone address the attached issue." Letter from Tom L. Olsen, President and CEO of Vanpac, to Colonel Thomas Government. Keller, United States Air Force, Deputy Chief of Staff for Passenger and Personal Property (June 2, 2005) (emphasis added).
>
> *I require advice* as to how American Vanpac/Echo Forwarders should file its rates in the international program . . . ." Letter from Tom L. Olsen, President and CEO of Vanpac, to Colonel Steven Amato, Deputy Chief of Staff for Passenger and Personal Property (October 26, 2006) (emphasis added).

Final Decision

Plaintiffs contend that a letter invoking the termination clause of their Exception Agreement was a final decision of the contracting officer for purposes of the Contract Disputes Act. The CDA provides that

> claims by the contractor . . . shall be in writing and shall be submitted to the contracting officer for a decision . . . . [T]he contracting officer shall issue his decision in writing and shall mail . . . a copy to the contractor. The decision shall state the reasons for the decision reached, and shall inform the contractor of its rights . . . .

41 U.S.C. § 605(a).

A final decision by a contracting officer is a prerequisite to this court's jurisdiction to hear a claim. *Cincinnati Electronics Corp. v. United States*, 32 Fed. Cl. 496 (1994). Whether a final decision has been issued is a matter for the court to decide objectively. We look at the nature of the communication, not whether contractor believes subjectively that the contracting officer has issued a final decision. *See Alliant Techsystems*, 178 F.3d at 1267-1268. The *Alliant* court ruled that the contracting officer had issued a final decision even though he stated in a letter that it was not the final decision. *Id.* (holding "[a] letter can be a final decision under the CDA even if it lacks the standard language announcing that it constitutes a final decision.") (citing *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir.1990)).

The contracting officer in *Alliant Techsystems*, "unequivocally reject[ed]" the plaintiff's arguments. 178 F. 3d at 1267. Plaintiffs made no arguments. The Government gave no indication that the issue was closed to further discussion, as in *Alliant Techsystems*. *Id.*

The Agency's letter stating its intention to invoke paragraph 6(b) of the Agreement did not address a "claim" and it could not have been a final decision. The letter states that plaintiffs' exemption from government regulations would expire upon implementation of the Families First Program. Plaintiffs had requested advice only; they could have responded to the Agency's decision to terminate. They did not argue that the Government could not invoke article 6(b) of the Agreement to terminate their exception.

## CONCLUSION

We do not have jurisdiction to entertain plaintiffs' claims on the merits. The

Exception Agreement is not a contract for services as required by the Contract Disputes Act. It is not a valid contract because it lacks consideration. Plaintiffs were obligated to operate separately and independently from one another to remain qualified providers. Status as a qualified provider permits the contractor to offer a bid for its services. A contract for services arose only after plaintiffs were qualified to submit a bid proposal, and the Government accepted their bid. The Agreement merely allowed plaintiffs to become or remain qualified providers. Separate and independent operation is a duty plaintiffs had to undertake irrespective of the Exception Agreement. Performing a pre-existing legal duty does not provide consideration.

Contractors operating under the CDA are required to submit a valid claim to a contracting officer and receive a final decision before coming to this court. Plaintiffs did not submit a valid claim, but only asked the Agency for advice. This was not a demand for relief as a matter of right. Plaintiffs presented no arguments or demands to the contracting officer. The contracting officer's statement invoking paragraph 6(b) of the Exception Agreement was not an unequivocal ruling on a demand for relief.

Defendant's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim is GRANTED. The Clerk of Court will dismiss plaintiffs' Complaint. No costs.

SO ORDERED.

s/Robert H. Hodges, Jr.
Robert H. Hodges, Jr.
Judge